**ACME STEEL COMPANY,**
Plaintiff,
v.
**EASTERN VENETIAN BLIND COMPANY, Defendant.**
Civ. No. 4265.

United States District Court,
D. Maryland.
March 31, 1955.

R. Dorsey Watkins, Baltimore, Md. (Riper & Marbury), Baltimore, Md., Glen E. Smith, Paul C. Miller and Donals P. Mullaney, Chicago, Ill., for plaintiff.

Morton M. Robinson, Baltimore, Md., and John Vaughn Groner, New York City, and William H. Webb, Morton Burden, Jr., Pittsburgh, Pa., and Ronald F. Ball, New York City, for defendant.

COLEMAN, Chief Judge.

This proceeding is supplementary to one involving the questions of validity and infringement by the present defendant, Eastern Venetian Blind Company, hereinafter referred to as "Eastern", of four patents of the plaintiff, Acme Steel Company, hereinafter referred to as "Acme", relating to metal Venetian blind strips or slats. In the original proceeding these four patents were held by this Court to be valid and infringed. See Acme Steel Co. v. Eastern Venetian Blind Co., D.C., 93 F.Supp. 233. On appeal, this Court was sustained with respect to the validity and infringement of three of these patents, 188 F.2d 247, and certiorari was denied by the Supreme Court, 342 U.S. 824, 72 S.Ct. 43, 96 L.Ed. 623.

One of the three patents involved in this previous litigation was Wilson patent no. 2,294,434, hereinafter referred to as the Wilson patent. In this present

supplementary proceeding, the sole issue is whether one of the ten claims of this Wilson patent, all of which were found valid and admitted to have been infringed in the original suit, namely, claim 1, which is a method claim, is also infringed by a certain method of forming metal Venetian blind slats which Eastern has produced commercially since the decree against it in the original suit.

Following the judgment of this Court in the original action, Eastern put on the market a machine which, in a single operation, produces, as conceded by Eastern, the same kind of metal Venetian blind slats as those produced pursuant to claim 1 of the Wilson patent. However, Eastern claims there are basic differences between the apparatus and process disclosed by the Wilson patent and the apparatus and process of Eastern which is alleged to infringe. Eastern asserts that whereas the Wilson patent describes and claims a two-stage operation for the forming of the slats which is carried out on two distinctly different machines, Eastern employs an entirely different basic principle, namely, forms the slat in a one-stage *bending* and not a *stretching* operation, on a single machine. On the other hand, Acme's contention is that Eastern's operation is in effect a two-stage one; that merely because the two stages are carried out by the use of a single machine does not avoid infringement, since infringement of a claim for a *method* only, such as claim 1 of the Wilson patent, does not depend upon the use of any particular *apparatus*; and that the apparatus shown in the Wilson patent is not the exclusive one which may be used in practising the method prescribed in claim 1, but that various other forms of apparatus may be employed within the scope of this method claim.

Claim 1 of the Wilson patent, with its two stages indicated by our insertion, for clarity, of the numerals (1) and (2), reads as follows: "The method of forming a longitudinally straight metal strip of non-planar cross section, which comprises the operations of (1) stretching longitudinally the metal of an elongated substantially flat strip between its edges by subjecting the strip between its edges to longitudinal tension of such magnitude that if the tension were released all parts of the metal between said edges would be under compression, and then (2) bending the strip transversely an effecting a stretching of the edge portions of the strip until all portions of the strip have been stretched longitudinally to substantially the same extent."

Summarized in simple language, the first stage of the method of claim 1 consists of stretching longitudinally the center portion of the strip, whereby a so-called buckling or waiving in this central portion is created; and in the second stage, the metal strip is run through another machine where it is bent transversely, that is, it is given a concave shape, and its *edge* portions are *stretched* until *all* portions of it have been elongated to substantially the same extent, and the buckling or waiving created in its center portion by the first stage operation is ironed out.

Commercially satisfactory Venetian blind strips must be longitudinally straight but at the same time be transversely curved, i. e., have a concave cross section in order to impart stiffness. Wilson states in his patent specifications that "if the full transverse cavity be imparted to the strip in a single rolling and bending step, an excessive stretching of the edge portions of the strip is produced, so that the resulting product is unsatisfactory, and it is necessary to use material which is relatively thick and soft, and thus unsuitable for Venetian blind slats. * * *

"The present invention involves the discovery that metal Venetian blind slats having a concaved cross section may be quickly and economically formed by a rolling and bending process which is carried out in two stages, in the first of which the metal strip is stretched in the region between its edges, leaving the edges substantially unstretched, while in the second stage the metal is

bent transversely and the edges are stretched, thus producing a properly concaved straight strip having parallel edges. * * *

"The function of the permanent elongation of the intermediate portion of the strip, which is effected during the first stage of the improved process, is to transform the irregularities in the strip into irregularities of a uniform kind or character so that the operations that are performed during the second stage of the process will produce predetermined results. It has been found that commercial strip steel, although substantially flat, has present therein a great number of irregularities of varying magnitude and character, such as relatively long edges, pockets or depressions at intermediate points and the like, even when the strip material is manufactured with the greatest of care and with the best available equipment, and these varying irregularities make it impossible to produce with certainty a straight slat having parallel edges, or other predetermined shape, by bending and rolling the strip. However, if the commercial strip is first stretched longitudinally between its edges sufficiently to stretch the metal to such an extent that all longitudinal elements of the metal between the edges of the strip are elongated as compared with the length of the edges, a uniform kind or character of irregularity is produced which enables the operations of the second stage of the process to produce a strip having the desired predetermined longitudinal shape."

A detailed analysis of the apparatus used in the Wilson patent method, and that used by Eastern, is essential to a proper comparison of the two methods. First, then, as to what the Wilson patent specifies. It calls for the use of two machines in a two-stage process. In the first stage machine the flat, unformed strip is fed into the apparatus from a coil. This machine is about 50 or 60 feet long and the strip passes, from left to right, through a series of driven friction rolls which are of relatively large diameter; then through a series of cylindrical rolls of relatively small diameter, and then over a crowned roll which causes the center of the strip to pass through a longer path than the edges, thus stretching the center. From the crowned roll the strip is passed over another series of rolls like the initial set of rolls, and is finally passed on to a winding coil. The strip is then fed from a coil into another machine, approximately six feet long, for the second stage operation, and passes, from left to right, through a pair of concave-convex rolls which transversely form the strip and at the same time stretch its edges to an extent equal to the stretch imparted to its center portion in the first stage operation. The strip is then passed on to a winding roll. This second stage operation is usually performed at another time and place.

Turning to the Eastern machine, its essential elements include a rotatable crowned forming roll and a stationary forming die, the latter consisting of two parts, called shoes or blocks, which are located beneath, and so as to co-act with the forming roll. The two shoes are similar, each having a concave upper face or trough running through its entire length. This concave curvature of the trough progressively increases from the entry end of the left, or entry shoe, toward the juncture of the two shoes, and progressively decreases from this point toward the exit end of the right, or exit shoe. It is the co-action between the forming roll and the shoes that transversely bends the strip as it passes through the shoes.

In the Eastern process the flat, unformed strip is fed into the machine from a coil on the left. As the strip passes between two feed rolls and then into the first, or entry shoe, it is bent transversely, and the bending increases progressively as the strip continues through this shoe. Then, as the strip passes on through the second, or exit shoe, the curvature of the strip progressively decreases. The shoes serve to support and restrain the strip so that it

will respond to the transverse bending imparted to it by the co-action of the rotating forming roll and the shoes. The edges of the strip are in contact with the sides of the troughs in the shoes throughout their entire length. The central portion of the strip is not in contact with the concave contour of the bottoms of these troughs, it being slightly above the deepest points in the trough. There is also a pair of concave-convex guide rolls located at the entry end of the entry shoe for guiding and assisting in the initial bending of the strip as it passes into the shoes. Also, at the exit end of the exit shoe, there is another pair of concave-convex guide rolls between which the strip passes, and is then passed on to a winding roll. These two pairs of rolls do not perform any of the forming operation.

The flat, unformed strips may vary somewhat in gauge and in other respects. Therefore, provision is made for taking care of such variations so as to produce longitudinally straight slats. This may be done by changing the path of the strip through the shoes and under the co-acting forming roll in several ways: (1) by changing the angularity of the two shoes; (2) by raising or lowering the position of the forming roll in the troughs of the shoes; (3) by raising or lowering the feed rolls on the entry side; and (4) by raising or lowering the guide rolls on the entry or exit side so as to modify the path of the strip through the machine, i. e., the depth of the strip in the troughs of the shoes. Adjustment of the exit guide rolls is the easiest for the operator to make, and is the one most commonly used.

Acme claims that the same two stages of the Wilson patent method are in fact carried out in the alleged infringing method of Eastern, even though there is only one machine used, as opposed to two used by Acme, and even though the operation of Eastern is a single, continuous one. More specifically, Acme asserts that the Eastern method is the equivalent of the Wilson patent method for the following reasons: (1) that the first stage of Acme performs the function of elongating the center portion of the strip in relation to its edges; that likewise, in the first stage of Eastern, this same function of elongating the center portion of the strip in relation to its edges is performed, and also another function, namely, that of transversely forming the strip by giving it a bow or concave shape; and (2) that in the second stage of Acme, two functions are performed, first, the elongation of the edges of the strip in relation to its center, and second, the transverse, i. e. the concave forming of the strip; and that likewise in the second stage of Eastern this same function of elongating the edges of the strip in relation to its center is performed immediately following the first stage operation and in the same machine, and that thus the only difference in the entire operation is that giving to the strip its concave form is done by Eastern in the first stage, whereas in Acme it is done in the second stage. In other words, Acme claims that the first stage of the operation of Eastern produces a longitudinal bow and that these results are in fact the same thing, being due to the paramount fact that the center of the strip is longer than the edges, which in Acme is manifested by the center being made longer than the edges by buckling, and in Eastern by the longitudinal bow; and that since this bow is removed by Eastern's second stage and a straight slat results, it follows that there is in the Eastern process, just as in the Acme process, a procedure in which the first stage puts the buckle or bow in, and the second stage takes it out.

Acme asserts that while "stretching" is emphasized both in the specifications and in claim 1 of the Wilson patent, this is not to be taken as limiting the claim to a practice in which the ultimate result is produced solely by stretching the metal, but includes the practice which Acme claims is equivalent by which, instead of stretching the metal, it may be compressed and shortened. It is admitted by Acme that there is no intermediate product, so to speak, which is

transversely curved in the Wilson patent process as is done in the first stage product of Eastern, because Wilson imparts the transverse curvature in the second stage so that this curvature appears for the first time in the finished slat. However, Acme claims that this difference is of no importance and has no bearing upon the total effect given to the metal strip in the complete process; in other words, that infringement is not avoided by transferring the curving step from the second to the first stage. In other words, Acme asserts that the Wilson patent is entitled to a liberal application of the doctrine of equivalents. Acme argues that since the Wilson patent two-stage process has made it possible to produce straight Venetian blind slats formed of hard, thin, resilient strip steel; since this invention has revolutionized the Venetian blind industry, and since the old rigid metal slats have largely disappeared from the market and wooden slats have very nearly disappeared, a defendant once held to be an infringer of the Wilson patent, as is true of Eastern as a result of the earlier litigation, should not now be permitted to escape when it still employs the gist of the Wilson patent invention, operating in substantially the same way to obtain the same result.

There is a good deal of conflicting testimony as to whether there is any change in the length of the paths of the different parts of the strip during the Eastern operation, so that the parts are no longer equal. We believe that any such changes as may occur in the Eastern operation are so relatively slight as not to be of any real materiality or aid in analyzing the similarity of the Eastern and the Wilson patent methods. Considerable confusion arises from the testimony as to precisely what has been proved by demonstrations of Eastern's process, these demonstrations having been conducted (1) before the trial, in Eastern's plant in the presence of representatives of Acme; and (2) in Court, in the course of the trial. Acme claims that its representatives present during the first, i. e., the plant demonstration, were improperly handicapped in their inspection by not being permitted by Eastern either to examine or to photograph some of what Acme described as Eastern's first stage material, i. e. material before it was subjected to what Acme described as the second stage, i. e., when it is bent downwardly over the lower exit roll. Testimony given on behalf of Acme by Wilson himself, the patentee, who witnessed the demonstrations in Eastern's plant, is that the strip had a definite longitudinal bow indicating that its center was longer than its edges during the so-called first stage operation. Wilson's demonstrations in the course of the trial, made on the model of Eastern's machine assembled by Acme, with the parts furnished to Acme by Eastern, appeared to give some support to this contention.

Wilson also testified that these plant demonstrations disclosed that, as the strip emerged from the blocks, it was back-bent heavily across the lower exit roll, and that this edge-stretching could also be accomplished on the Eastern machine by simply pulling the edges of the strip downwardly across the exit end of the exit block. Wilson's corresponding demonstrations during the trial appeared to give some support to this contention also.

We now turn to further consideration of the grounds on which Eastern, the defendant, rests its contention that it does not infringe claim 1 of the Wilson patent. In substance, Eastern's position is that it cannot be held to infringe without doing violence to the proper definition of "equivalents", that is, without stretching claim 1 of the Wilson patent to cover *any* means by which a satisfactory blind slat may be made; that Eastern's operation is a single-stage, non-stretching process as opposed to the two-stage, stretching process of the Wilson patent, and that, therefore, while both methods perform the same function, Eastern accomplishes this by a method that is fundamentally and substantially different from that of Wilson. Eastern maintains that this is made apparent by the sequence of steps prescribed by the Wilson patent and by the reason which compels that sequence, namely, a stretching of the

center portion of the slat in the first stage, then a stretching of its edges and giving it a concave form in the second stage,—a sequence which Eastern maintains is not merely a matter of convenience, but is the very heart of the process of the Wilson patent. In support of this contention, Eastern relies upon the sworn testimony of the patentee, Wilson, at the trial, that "It is necessary for the operation of this [the Wilson] machine to use center stretched stock * * *. It [the machine] will not take the material that does not have center stretched stock." Thus Eastern maintains that there can be no equivalence where one process does what another process says is not to be done; and where one process omits an operation which the other process prescribes.

The question at issue is rendered more difficult by reason of the virtual impossibility of seeing and measuring precisely what occurs, as respects the character and extent of the forces that are brought to bear upon the strip during its course through the Eastern machine,—a course which is inherently continual and not fully visible. The testimony of George Sachs, Research Professor in Metallurgy at Syracuse University, as well as of Henry W. Nieman and George O. Maish, Research Engineers of Bethlehem Steel Company, all testifying for Eastern, was that elongation of the center portion of the strip in relation to the edges is not carried out at any stage in the operation of the Eastern machine; that conversely, elongation of the edges of the strip in relation to the center portion likewise is not carried out at any stage in the operation of the Eastern machine; that there is no permanent change in the formation of the strip in the operation of the Eastern machine after the strip has passed the point in the machine where maximum curvature is imparted to the strip, namely, just beyond the forming roll; in other words, that such slight arching of the strip as may be given to it between the exit rolls and the winding coil does not result in any permanent elongation or longitudinal change in the strip.

There was also considerable testimony given by both parties with respect to so-called etching tests applied to sample strips, namely, the removal, by the application of acid, of the outer layers of the strips. Both sides were in agreement that etching tends to remove from the strip the effect of the last operation performed upon it, and to restore the strip to its condition prior to that last operation. It was shown, through placing in evidence strips that had been subjected to these tests that a strip that was merely die-bent, which it was agreed by both sides involved no stretching, lost its transverse curvature and resumed its original flat condition when etched. On the other hand, it was shown that a strip that had been subjected to the first stage process of the Wilson patent and nothing more, and was then etched, lost its transverse curvature, but that, unlike the strip that had been merely die-bent, took on the longitudinal curvature; in other words, did not resume its original flat condition; whereas a strip formed on the Eastern machine came out precisely like that which had been die-bent, namely, resumed its original *flat* condition when etched.

After a careful review of the entire testimony, much of which is highly technical and full of conflict, we reach the conclusion that the weight of the credible testimony does support Eastern's contention that the basic concept in design and operation of the Eastern machine are different from the Wilson patent concept and design in that Eastern provides the means whereby the length of the path of both the edges and the center of the strip will be maintained the same during the forming operation, which is a single, continuous, indivisible operation; and that any adjustments of the feed rolls or guide rolls on the Eastern machine after its original setting for operation are minor and are not made for the purpose of creating stretching tension in any particular part of the strip, but merely to overcome any variance in the guage or stiffness of the strip from its gauge or stiffness existing

at the time of the original setting of the machine, prior to commencing the operation. Having thus concluded that the process involved in forming the strip in conformity with the Wilson patent is different from the process employed in forming the Eastern strip for the reasons just defined, it remains to be determined whether the two methods are, in spite of such difference, nevertheless to be treated, as Acme contends, as equivalents under our patent law. We, therefore, now turn to a consideration of the principles of patent law applicable to the present case.

It is well settled that infringement of a method patent is not avoided merely by employing it in a machine of different structure. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733; Lever Bros. Co. v. Proctor & Gamble Manufacturing Co., 4 Cir., 139 F.2d 633. Also, a mere reversal of steps does not avoid infringement. Proctor & Gamble Manufacturing Co. v. Refining, Inc., 4 Cir., 135 F.2d 900. Thus, the making of patentable improvements over the invention does not avoid infringement, even though a patent may be issued for them. Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778; Crown Cork & Seal Co. of Baltimore City v. Aluminum Stopper Co., 4 Cir., 108 F. 845; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912. But it is equally well settled that the claim of a method patent is not infringed where any one of the steps or series of acts set forth in the claim as constituting the method or process is omitted, unless some equivalent step or act is substituted for it. Anthony v. Sherman, 4 Cir., 159 F.2d 995.

No aid to the solution of the problem presented in the present case is found in the original suit between the present parties because there, Eastern, the defendant, admitted infringement by its process it was then using which was a two stage process and virtually identical with the Wilson patent process. As stated by the Court of Appeals in its decision in the prior litigation, 188 F.2d 247, at page 249, "Infringement of all four patents was admitted by Eastern, but Eastern attacked the validity of all the patents and interposed other defenses. The District Court held all the patents valid and infringed, and decided against Eastern on all of the defenses interposed by Eastern." We must, therefore, turn to a consideration of decisions which define the doctrine of equivalents in the patent law. This doctrine is dealt with fully in a rather recent decision of the Supreme Court in the case of Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097. While this decision deals with a composition or product claim of a patent rather than with the device or method itself, what the Court says with respect to equivalents is pertinent to the issue in the present case. The Linde Air Products Co., owner of a patent for an electric welding process and for fluxes to be used therewith, had brought an action for infringement against several companies. After extensive litigation in the lower Federal Courts, the case was heard in the Supreme Court, 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672, and a rehearing was granted 337 U.S. 910, 69 S.Ct. 1046, 93 L.Ed. 1722, but limited to the question of infringement of four flux claims that were found to be valid, and to the applicability of the doctrine of equivalents to findings of fact. In its final opinion, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, the Court held that the trial Court was justified in finding, with respect to the claim of a combination of alkaline earth metal silicate and calcium fluoride, that the substitution in the accused composition of manganese silicate (which is not an alkaline earth metal silicate) for magnesium silicate (which is an alkaline earth metal silicate), where the two compositions were substantially identical in operation and result, was so insubstantial, in view of the technology and the prior art, that the patent was infringed under the doctrine of equivalents. While, as will be seen, the facts in the case before the Supreme Court are not at all parallel to those before us, the doctrine

of equivalents as defined by the Court in its opinion, is controlling. The Court said, 339 U.S. at pages 607–610, 70 S.Ct. at page 856: "One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

"The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 15 How. 330, 14 L.Ed. 717, it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. 'To temper unsparing logic and prevent an infringer from stealing the benefit of the invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. * * * The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 568, 18 S.Ct. 707, 722, 42 L.Ed. 1136. * * *

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. * * *

"A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. It is to be decided by the trial court and that court's decision, under general principles of appellate review, should not be disturbed unless clearly erroneous. Particularly is this so in a field where so much depends upon familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience."

In Machine Co. v. Murphy, 97 U.S. 120, 24 L.Ed. 935, the Supreme Court had before it the combination in a patent claim consisting of a fixed knife, with a striker and other means employed to raise the striker and let it fall to perform the cutting function in paper bag machines. The Court held that this was substantially the same thing as an ascending and descending cutting device embraced in another patent, the two cutters being substantially alike. The Court said, 97 U.S. at pages 125–126: "Except where form is of the essence of the in-

vention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result.

"Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every such investigation to look at the mode of operation or the way the device works, and at the result, as well as at the means by which the result is attained.

  *   *   *   *   *   *

"Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape. Curtis, Patents (4th ed.), sect. 310.

"Apply that principle to the case before court, and it is clear that the knife in the respondents' machine, when considered in connection with the striker, is substantially the same thing as the cutter in the machine of the complainants when put in operation by the means employed to raise it and let it fall to perform the cutting function, without which the machine would be of no value."

In Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136, a device for a fluid-pressure brake for railroad cars was held not an infringement of a patent for a fluid-pressure automatic-brake mechanism. Here again, the devices and the methods of their operation have no factual relation to what is presently before this Court. However, what the Supreme Court said in the Westinghouse case is important in interpreting whether the Wilson patent process and the Eastern process are equivalents. The Supreme Court said, 170 U.S. at pages 568–573, 18 S.Ct. at page 722: "The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent. 'An infringement,' says Mr. Justice Grier in Burr v. Duryee, 1 Wall. 531, 572 [17 L.Ed. 650], 'involves substantial identity, whether that identity be described by the terms, "same principle," same "modus operandi," or any other. * * * The argument used to show infringement assumes that every combination of devices in a machine which is used to produce the same effect, is necessarily an equivalent for any other combination used for the same purpose. This is a flagrant abuse of the term "equivalent." '

"We have no desire to qualify the repeated expressions of this court to the effect that, where the invention is functional, and the defendant's device differs from that of the patentee only in form, or in a rearrangement of the same elements of a combination, he would be adjudged an infringer, even if, in certain particulars, his device be an improvement upon that of the patentee. But, after all, even if the patent for a machine be a pioneer, the alleged infringer must have done something more than reach the same result. He must have reached it by substantially the same or similar means, or the rule that the function of a machine cannot be patented is of no practical value. To say that the patentee of a pioneer invention for a new mecha-

nism is entitled to every mechanical device which produces the same result is to hold, in other language, that he is entitled to patent his function. Mere variations of form may be disregarded, but the substance of the invention must be there.

\*   \*   \*   \*   \*   \*

"We are induced to look with more favor upon this device, not only because it is a novel one, and a manifest departure from the principle of the Westinghouse patent, but because it solved at once, in the simplest manner, the problem of quick action, whereas the Westinghouse patent did not prove to be a success until certain additional members had been incorporated into it. The underlying distinction between the two devices is that in one a separate valve and separate by-passage are provided for the train-pipe air, while in the other the patentee has taken the old triple (or quadruple) valve, and by a slight change in the functions of two of its valves, and the incorporation of a new element, (partition 9) has made a more perfect brake than the one described in the Westinghouse patent. If credit be due to Mr. Westinghouse for having invented the function, Mr. Boyden has certainly exhibited great ingenuity in the discovery of a new and more perfect method of performing such function. If his patent be compared with the later Westinghouse patent, No. 376,837, which appears to have been the first completely successful one, the difference between the two, both in form and principle, becomes still more apparent, and the greater simplicity of the Boyden patent certainly entitles it to a favorable consideration. If the method pursued by the patentee for the performance of the function discovered by him would naturally have suggested the device adopted by the defendants, that is in itself evidence of an intended infringement; but, although Mr. Boyden may have intended to accomplish the same results, the Westinghouse patent, if he had had it before him, would scarcely have suggested the method he adopted to accomplish these results. Under such circumstances, the law entitles him to the rights of an independent inventor."

In Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147, patent for an improved latch of the swinging lever type, particularly adapted for use on doors of refrigerators, etc., was held to be infringed by latches manufactured under another patent, since the Court found that the two devices were substantially identical. Again, the facts involved in that case are not at all related to those before us, but it is appropriate to point out that the Supreme Court in its opinion set forth the same rule as to equivalents which we have quoted from its previous decisions.

In support of its contention that the Eastern process is none other than an equivalent under our patent law of the Wilson patent process, Acme relies strongly upon Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, Wine Railway Appliance Co. v. Baltimore & O. R. R. Co., 4 Cir., 78 F.2d 312, and Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910, all of these being decisions of the Court of Appeals of this Circuit.

In the Hoeltke case the patent covered an automatic fire check for use in gas burners to prevent ignition of gas and air mixture in pipe lines, with consequent explosion. The Court of Appeals for this Circuit held this patent to have been infringed by automatic fire checks manufactured and sold by the defendant. The Court held that the latter contained all of the elements of complainant's device; that they all operated the same way to produce the same result and that infringement was not avoided because a housing was provided for a lever or because the fusable element was attached to the lever, instead of to a pin being attached; or by the slightly different location of the members of the combination. It is obvious without quoting from the opinion in that case that there is no such identity of the two machines and their method of operation involved in the present case.

The Wine Railway Appliance Co. case involved a patent relating to locking devices for drop door railroad cars. The Court, in finding that the accused devices were equivalent to the device of the patent, said, 78 F.2d at page 316: "And we think it equally clear that patent No. 1,268,725 is infringed by the X. L. T. devices of defendant. The only difference between these devices and the device of the patent is that, whereas the patent has independently movable gravity acting hooks which engage a fixed projection from the door bar, these devices have hooks fixed to the side of the car or hopper and engage them with independently movable gravity acting latches attached to the door bar. There is the same sort of door, the same sort of door bar, the same sort of operation, and the same means of operating the locking device, i. e., the force of gravity. The same result is accomplished in substantially the same way; and we do not think that infringement is avoided by a slight rearrangement of parts within the reach of the skill of any ordinary mechanic, when the heart and substance of the invention is taken." The Court then referred to a number of cases. But here again, the similarity between the devices involved was so much greater than the similarity of the machines in the present case that it seems unnecessary to dwell further upon that case.

In the Black & Decker Mfg. Co. case there is also nothing in the facts that is helpful in the present decision on the question of what is an equivalent. There, the patent involved covered a manually portable platform scale for the determination of bearing pressure on vehicle tires. No claim was made that the weighing device of the patented scale was itself patentable. The patentee used an old and well known weighing device, and the infringing scale substituted for this a device equally well known.

There are many other patent decisions in the Supreme Court and in the lower Federal Courts, in some of which the facts involved may be somewhat more akin to those in the present case, and in some may be not as similar as those in the cases which we have just analyzed. But in any event, further citation or analysis of decisions would appear to serve no useful purpose. Each case must be decided upon its own facts. Even though not to be classified as a pioneer process, the Wilson patent two-step process is undoubtedly entitled to liberality of interpretation. But we are satisfied that such liberality as can properly be given to the doctrine of equivalents, as set forth in the authorities which we have just analyzed, does not justify our holding that Eastern's process is nothing more than an equivalent of the Wilson patent process.

The following passage from the opinion of the Court of Appeals in the original suit between the present litigants is significant and supports our conclusion, 188 F.2d at page 251: "The First Wilson patent, as we have seen, describes a process which is carried out in two stages, in the first of which the metal strip is stretched between the edges while in the second stage the edges are stretched, thus producing the concave strip, which constitutes the slat in the finished product. Acme was not equipped to manufacture, sell and install completed blinds, and did not desire to do so. It was, however, qualified to carry on the first stage of the process and to produce the slat stock to be used in the second stage of the process. There were very few blind manufacturers in the country who were able to make the substantial investment to carry on the first stage of the process. Hence it was decided that in order to maintain the high quality of the material, it would be best to confine the practice of the first stage to Acme and to a limited number of reliable steel producers; and since neither Acme nor the other steel producers desired to make and install the finished article, it was decided to grant to the blind manufacturers licenses to practice the second stage of the process with the use of the product of the first stage manufactured by Acme or the other steel producers." From the aforegoing it will be seen that Wilson was not seeking a one-stage process. On the contrary, he

considered his two-stage process essential to a really satisfactory product,—so much so that there is nothing in the specifications or claims of his patent which teach achieving the same objective, namely, the forming of satisfactory Venetian blind slats in a single stage process. It is true that the patent specifications state that "Although a certain form of the improved strip material and one embodiment of the improved method have been disclosed by way of example in connection with the description of one form of the improved apparatus, it will be understood that the article, the method, and the apparatus may be modified in various ways without departing from the scope of the appended claims." However, neither the specifications, drawings nor claim 1 describe any other apparatus than that for the two-stage method. So the statement just quoted is to be treated as nothing more than a catch-all clause of no materiality in the present controversy.

For the aforegoing reasons a decree will be signed in favor of Eastern, the defendant, holding that its device does not infringe claim 1 of the Wilson patent, and dismissing the complaint.