**EASTERN VENETIAN BLIND CO. v. ACME STEEL CO.**

No. 6176.

United States Court of Appeals Fourth Circuit.

Argued Jan. 8, 1951.

Decided April 5, 1951.

John Vaughan Groner, New York City (Fish, Richardson & Neave, New York City, William .H. Webb, Morton Burden, Jr., Pittsburgh, Pa., and Morton M. Robinson, Baltimore, Md., on the brief), for appellant.

Glen E. Smith, Harold Olsen, and Edward R. Johnston, Chicago, Ill. (R. Dorsey Watkins, Baltimore, Md., on the brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

. DOBIE, Circuit Judge.

Acme Steel Company (hereinafter called Acme) instituted in the United States Dis-

trict Court for the District of Maryland, against The Eastern Venetian Blind Company (hereinafter called Eastern) a civil action for patent infringement. The four patents in suit, owned by Acme and all covering slats for Venetian blinds, were in chronological order: (1) Wilson, No. 2,294,434, (1942) (hereinafter called First Wilson); Morse, No. 2,315,640, (1943); Hunter, No. 2,337,047, (1943); and Wilson, No. 2,338,678, (1944) (hereinafter called Second Wilson).

Infringement of all four patents was admitted by Eastern, but Eastern attacked the validity of all the patents and interposed other defenses. The District Court held all the patents valid and infringed, and decided against Eastern on all the defenses interposed by Eastern. The case is before us on Eastern's appeal.

We first consider the inherent validity of the four patents in suit, apart from the defenses interposed by defendant—Acme's alleged misuse of the patents to secure a monopoly of unpatented material and the defense that Acme is foreclosed from any relief on the ground of laches and estoppel.

 First Wilson, No. 2,294,434, presents, we think, the clearest case of validity of any of the patents in suit. This is a method and apparatus patent for forming Venetian blind slats and material therefor. This patent is described as follows in the District Judge's opinion: "As stated in this patent, the invention which it is alleged to embody involves the discovery that metal Venetian blind slats, having a concave cross section, may be quickly and economically formed by a rolling and bending process which is carried out in two stages, in the first of which the metal strip is stretched in the region between its edges, leaving the edges substantially unstretched; while in the second stage the metal is bent transversely and the edges are stretched, thus producing a properly concave straight strip having parallel edges." [93 F.Supp. 234.] We think that the two-step process of first deliberately producing the buckling of the slat by center stretching and then removing the buckle by edge stretching, and the mechanism for carrying out this two-step process was entirely new. Its commercial success

should also be considered to resolve any doubts as to its novelty and utility.

There is not merit in Eastern's contentions that this patent is a mere aggregation of known elements or that there is insufficient disclosure in the claims and specifications of the patent. Nor is this patent invalid under the prior art. There is nothing in Potter, Westaway, Bailey or Ainsworth which in reality could be said to read on First Wilson.

 We think the Morse patent, No. 2,315,640, is invalid for lack of invention. There are two claims in this patent which are very brief and which we think are too broad. These two claims read as follows:

"1. A metal Venetian blind slat comprising a strip of material having a single convex-concave curve from edge to edge, the curve being about a single center, the material being normally substantially straight in a longitudinal line, and the material having sufficient resilience to be coiled upon itself and when released to resume its original, substantially straight form by its inherent resilience.

"2. A metal Venetian blind slat comprising a strip of material of single thickness from edge to edge and continuously and gradually curved from edge to edge, the material being normally substantially straight in a longitudinal line and of sufficient resilience to be coiled upon itself and when released to resume its original, substantially straight form by its inherent resilience."

This is a product patent. All that Morse really contributed was a requirement that the steel should be resilient so that when coiled, it would spring back to its original shape. While none of the prior patents seemed to specify in precise terms that the steel should be resilient, this is rather implied in the prior art and one skilled in the art would conclude that the more resilient the steel, the better it would be suited for Venetian blind slats. As we said in Goldman v. Polan, 4 Cir., 93 F.2d 797, 799: "It is well settled that 'it is not invention to substitute superior for inferior materials.'" See, also, Slayter Co. v. Stebbins-Anderson Co., 4 Cir., 117 F.2d 848, 851. In the Far-

rand product, though it is in a somewhat different field, there is the requirement that the metal be sufficiently flexible to permit its being rolled or coiled, its stiffness and resiliency being sufficient to cause it to remain in, or to return to a straight or unrolled condition, when it is released or free to move. Stiffness and resiliency are characteristics of high carbon steel. Particularly germane in the prior art here is the Moore patent, No. 1,949,653, which discloses a metal slat strikingly similar to Morse. Also might be cited here the Buck, the Ainsworth and the Potter patents. The claims of Morse are not directed to any combination but rather to a single homogeneous article, and see again the Goldman case, where we said: "it is not invention to apply an old material to a new or analogous use or subject." Finally, the very broad claims of the Morse patent are not appreciably limited by the rather brief specifications.

■ We think the Hunter patent, No. 2,337,047, is valid. This is a method and apparatus patent. Hunter's use of die blocks set at different angles is sufficiently novel to constitute invention. In the prior art, there is nothing similar to Hunter with the exception of First Wilson, and Hunter's mechanism and process present patentable differences from First Wilson. Any conflict between Hunter and First Wilson is academic for the purposes of this suit, since both patents are owned by Acme. Hunter proceeds on the theory of starting with more perfectly formed steel than Wilson and asserts that the Hunter die blocks, compared with the First Wilson crowned rollers, provide an improved method of selectivity stretching as well as easier adjustability of the amount of stretch. We find no merit in Eastern's contentions that Hunter was not really the inventor and that Hunter involves inadequate disclosure.

Claim 3 of Hunter (a typical apparatus claim) and Claim 8 of Hunter (a typical method claim) are here set out:

"3. The combination in apparatus for stretching a longitudinal portion of a long substantially flat metal strip, of a plurality of sets of die blocks each having a longitudinal passage therethrough which is of such non-planar cross section transversely of the strip that said strip may be moved through said passages without affecting the permanent transverse forming of the strip, said passages in said die blocks being relatively inclined longitudinally.

\* \* \* \* \* \*

"8. The method of producing a substantially flat elongated metal strip having its central portion elongated with respect to its edge portions, which consists in feeding the strip endwise and maintaining longitudinal tension therein while moving the strip through a plurality of successive longitudinally straight, transversely bowed confining passages which are relatively inclined longitudinally of the strip, maintaining the transversely acting stresses in the strip during said movement below the elastic limit of said metal, and compelling different portions of the strip which are laterally displaced from each other to follow paths of different lengths in passing from one of said passages to the other."

■ Second Wilson, No. 2,338,678, appears to us to be a valid patent. This is a method and apparatus patent, designed as an improvement on First Wilson. This improvement consists essentially of adding a third stage to the two-stage process of First Wilson. Under this third stage, the transversely curved strip material, after passing through the forming rolls of the second stage, is flexed in a direction transverse to its line of travel, whereby it becomes buckled or progressively flattened by the removal from its successive portions of a large part of the transverse curvature that had been imparted by the forming rolls. After passing through the flattening operation, the transverse curvature returns, but to a lesser degree, to the strip, due to its resiliency. In this manner a greater degree of curvature is removed from the strip material which has a greater thickness, thus producing the result that the strip material is caused to assume approximately the same transverse curvature. There is nothing in the prior art that anticipates this disclosure. Second Wilson seems to embody a rather clear advance over First Wilson and Hunter, and there is certainly nothing anticipatory in Morse. There is no

merit in the defense here again asserted that Second Wilson is a mere aggregation as opposed to a combination. We think the District Judge was right in upholding the assertion that Second Wilson produces a uniformity of the lateral arc in a manner not previously disclosed. Nothing in the prior art discloses that by merely changing the direction of the strip, its gauge would then be flattened, but that when released the strip would snap back with a uniform lateral arc to a straight longitudinal form.

The defendant seeks to escape the effects of its infringement by setting up the contention that Acme has not come into court with clean hands in that it has established a sham licensing system under the patents designed to secure for it a monopoly in the sale of unpatented goods and has thereby violated the established rule that a patent owner may not exact as a condition of a license that unpatented materials used in connection with the invention shall be purchased only from the licensor, and if he does so, relief against an infringer will be denied. Carbice Corp. v. Am. Patents Corp., 283 U.S. 27, 31, 51 S.Ct. 334, 75 L.Ed. 819; Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376.

The First Wilson patent, as we have seen, describes a process which is carried out in two stages, in the first of which the metal strip is stretched between the edges while in the second stage the edges are stretched, thus producing the concave strip which constitutes the slat in the finished product. Acme was not equipped to manufacture, sell and install completed blinds, and did not desire to do so. It was, however, qualified to carry on the first stage of the process and to produce the slat stock to be used in the second stage of the process. There were very few blind manufacturers in the country who were able to make the substantial investment to carry on the first stage of the process. Hence it was decided that in order to maintain the high quality of the material, it would be best to confine the practice of the first stage to Acme and to a limited number of reliable steel producers; and since neither Acme nor the other steel producers desired to make and install the finished article, it was decided to grant to the blind manufacturers licenses to practice the second stage of the process with the use of the product of the first stage manufactured by Acme or the other steel producers.

The result was that on June 10, 1944, Acme granted to the Thomas Steel Company a license to practice the first stage only of the process under the First Wilson patent and the Hunter patent in the production of slat stock, provided that the stock so produced should be sold only to second stage licensees. On February 23, 1944, Acme granted licenses to a number of blind manufacturers to practice the second stage of the First Wilson patent with the use of slat stock produced by the practice of the first stage of the process and required an agreement from the licensees to purchase this stock either from the licensor or from producers of slat stock licensed by it. The feature in these licenses which limited second stage licensees to the purchase of steel stock from first stage licensees forms the basis of the defendant's attack upon the license system on the ground that slat stock is not itself patented and therefore the restriction upon the purchase of the material in the second stage licenses was an attempt to extend the monopoly of the patent to cover the sale of unpatented goods.

The 1944 licenses, however, were modified by Acme prior to the trial of the case in the District Court. The evidence shows that in negotiations with a steel manufacturer with regard to the grant of a first stage license, objection was made to the restriction on the sales of slat stock to second stage licensees. Accordingly it was determined to modify the first stage licenses and subsequently to modify the original second stage licenses to eliminate this provision. On December 1, 1948, a new form of license was granted to the Thomas Steel Company wherein the proviso that the slat stock produced by the licensee should be sold only to second stage licensees was omitted; and on July 1, 1948, the second stage licenses were modified so as to eliminate the agreement that the licensee should purchase its requirements of slat stock from the licensor or second stage licensees, but in the new license the licensor agreed to furnish the licensee from time to time the

names and addresses of its first stage licensees.

The present action was instituted in the District Court on December 8, 1948, and the contention now made was advanced on the basis of a motion by the defendant for summary judgment. This motion, however, was overruled. The defendant contended that although the restriction upon the purchase of slat stock contained in the second stage licenses had been removed, nevertheless the requirement still remained as the result of the control which Acme was able to exercise over the second stage licensees. The court rejected this contention but directed that certain paragraphs of the license agreement be rephrased so as to make it entirely clear that the licensee had the right to practice the process with the use of slat stock no matter where procured, provided it was produced by the first stage process, and a provision to this effect was inserted in the judgment of the court rendered on May 19, 1950.[1] Acme accepted this direction, cancelled the outstanding licenses, offered new licenses which incorporated the changes directed by the court, and accompanied the agreement by a letter of June 9, 1950, containing the express statement that the change was intended to make it impossible for the license agreement to be misinterpreted as requiring that the second stage licensees purchase their requirements of slat stock either from Acme or from its first stage licensees.[2]

Notwithstanding the verbal changes in the most recent license agreements, the defendant still contends that the second stage licensees remain under the domination of Acme and are in fact compelled to continue the purchase of slat stock from it or its first stage licensees for the reasons which may be stated as follows: There is no need for the second stage licenses unless the purpose is to compel the sale of unpatented material, from which Acme derives its chief benefit under the patent. Acme charges only a flat fee of $25.00 for each second stage license and has derived only $30,000.00 in the aggregate from this source; but the sales of slat stock by Acme and its first stage licensee Thomas have amounted to thirty million dollars and the royalty paid by Thomas to Acme on sales is 4% of the selling price. A sale of slat stock by a first stage licensee carries with it under the rule of United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408, a license to the purchaser to finish the article, even though the purchaser has no license from the owner of the patent. Hence the second stage licenses were neither profitable to Acme nor necessary to protect the manufacturer of the finished article, but were designed to compel the manufacturers to buy their supplies from Acme or Thomas. To this end other provisions were inserted in the license agreements to strengthen Acme's control, and therein the licensee is still advised that first stage licensees are engaged in the manufacturing and selling of slat stock for use in making Venetian blinds and the license covers only the use of slat stock produced by the practice of the first stage and does not include the right to practice the first stage of the process. Moreover, the licensor agrees to furnish the licensee with the names and addresses of the first stage licensees. The licensor agrees to furnish slat stock of high quality and the licensee agrees to maintain an equal quality in the manufacturing operation and the lessor reserves the right to cancel the license if the quality is not maintained. The licensee also acknowledges the validity of the letters patent and agrees to inform the licensor of every instance of infringement which comes to the licensee's attention; and this agreement would require the licensee to report to Acme the name of any unlicensed person selling slat stock. It is contended that these provisions effectually continue Acme's control over the second stage licensees and hence it does not clearly appear that the improper practices have been fully abandoned or that the consequences of

---

1. Under the direction of the court a recital in the 1948 license agreement that the licensee desired to purchase slat stock from the licensor or its first stage licensees was eliminated.

2. The evidence does not show that the second stage licensees felt obliged to purchase only from Acme or Thomas; and there is some evidence that they actually made purchases from others.

the misuse of the patent have been dissipated and therefore the patentee is not entitled to enforce its patent rights under the rules laid down by the courts.

The defendant relies particularly on United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408, and upon the established rule prohibiting the extension of the monopoly of a patent to cover unpatented goods, which is laid down in a line of cases of which Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, is the most striking example. It is contended in the first place that in the Univis case the court condemned the sort of licensing system which Acme has installed. With this position we are unable to agree. It is true that the Univis system is strikingly similar to that of Acme in that it covered a two-step process which included the manufacture of lens blanks for eyeglass lenses, and also the process of grinding and polishing them in the finished lenses; and separate licenses were issued to different persons for the two steps with the provision that one licensee should make and sell the blanks to other licensees who in turn were authorized to buy them and finish them according to the patent and to sell them to other licensees who in turn were authorized to sell to the public, the prices in all cases being fixed by the owner of the patent. The decision turned on the price fixing feature which the court condemned; but the court did not criticize the issuance of two classes of licenses. It held that the sale of the lens blanks which were capable of use only in practicing the patent, was a complete transfer of ownership within the protection of the patent law and a license to practice the final step; but it assumed that the sale of blanks by an unlicensed manufacturer to an unlicensed finisher would constitute contributory infringement, and did not question that stipulations for royalties or otherwise might have been exacted as a part of the entire transaction so long as they did not seek to control the disposition of the article after the sale.

There is no illegal price-fixing feature in the Acme licenses and no impropriety in authorizing one class of licensees to manufacture slat stock and another class to finish it under such conditions as will protect the owner of the patent and procure for it the rewards incident to ownership. Furthermore, it is not true that the second stage licenses serve no lawful purpose; for even if the mere sale of slat stock by the owner or its licensee would authorize the purchaser to finish the goods under the process of the patent, the imposition of a royalty or license fee in connection therewith would not be unlawful. Indeed the license would protect the finisher from the charge of contributory infringement in case he should buy his material from an unlicensed producer, and if no second stage licenses were issued, competition in the sale of slat stock would be diminished, because the finishers would be obliged to buy their material from Acme or a first stage licensee to avoid the charge of contributory infringement. The infringer, in the instant case, is not being sued for contributory infringement because it sold the slat stock that is unpatentable material but because it completely infringed the patent.

Even if it is legal to establish a license system in which different persons are licensed to practice separate stages of the patented process, such a system nevertheless cannot be sustained insofar as it may be used to restrict competition in unpatented material. The Mercoid decision lays down the rule that even if an unpatented device has no use other than in the combination of the patent and is itself an integral part of the patented structure, it may not be subjected to a limited monopoly by restrictions upon its purchase by licensees under the patent. It may be questioned whether the rule extends to the present situation in which the unpatented article, that is, the slat stock, has been subjected to a part of the process covered by the patent and is to be finished in accordance therewith; but that question need not be decided since Acme, recognizing the strict limits within which the patent monopoly must be exercised, released its second stage licensees from any restriction upon their purchase of slat stock before the trial of the case in the District Court, and has also complied with and put into effect the modification of its license agreements, in accordance

with the judgment of the District Court, and has notified all of its second stage licensees that they may purchase slat stock wherever they see fit. By these actions whatever defect was found in the early licenses has now been removed and the case falls within the rule which is equally well established that even if a patentee has in the past misused his patents, he is entitled to equitable relief after the misuse has been fully abandoned. See the following decisions of this court and the cases therein cited. Sylvania Industrial Corp. v. Visking Corp., 4 Cir., 132 F.2d 947, 958; Westinghouse Elec. Corp. v. Bulldog Electric Products Co., 4 Cir., 179 F.2d 139, 145–146; Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 181 F.2d 550, 571. See, also, Novadel-Agene Corp. v. Penn, 5 Cir., 119 F.2d 764; Campbell v. Mueller, 5 Cir., 159 F.2d 803.

■ Eastern has also interposed the defenses of laches and estoppel based on the conversation between Wilson, representing Acme, and Rosenbaum, representing Eastern. According to the testimony of Rosenbaum, Eastern sought a complete license under Acme's patents but this request was denied because Eastern was a Venetian blind manufacturer and therefore entitled only to a Number Two license. Rosenbaum testified further that Wilson "explained to me, no, they don't want me in the steel business," and that Wilson also said to Rosenbaum: "You are going ahead anyhow. Why don't you go ahead? We haven't got the steel to support the industry anyhow. Go ahead. However I will let you know before bringing suit and we will have another discussion about this." See, in this connection, the following cases all decided by our Court: Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 181 F.2d 550, 564–567; Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778, 782–783; Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, 4 Cir., 165 F.2d 693, 695; Union Shipbuilding Co. v. Boston Iron & Metal Co., 4 Cir., 93 F.2d 781, 783.

The effect of all the foregoing, we think, is not to preclude plaintiff with respect to the future, but is merely to bar the right of plaintiff to recover damages for infringement of the three patents held to be valid until plaintiff had purged the licenses of the objectionable restrictions. Since this purge was not completely accomplished until June 9, 1950, damages are not recoverable for any infringement prior to this date.

The decree of the District Court is affirmed in so far as it holds the First Wilson patent, the Hunter patent and the second Wilson patent to be valid and infringed and in so far is it holds Acme to be entitled to an injunction against future infringement of these three patents by Eastern. The District Court's decree must be reversed in so far as it holds the Morse patent valid and in so far as it holds Acme entitled to damages for the infringement, up to the date of the complete purge, June 9, 1950, by Eastern of the three patents which we have held to be valid and infringed by Eastern.

The decree of the District Court, when modified according to this opinion, will be affirmed.

Modified and affirmed.