**Solomon M. COLLINS and Closures, Inc., a corporation of Michigan**

**v.**

**Barney H. KRAFT, Barney H. Kraft, Jr., Alvin Kraft, and Southern Venetian Blind & Awning Corp., a corporation of Maryland, and Charles Kraft, doing business as The Beauty Fold Door Co.**

**Civ. No. 7098.**

United States District Court
D. Maryland.

July 25, 1956.

Niles, Barton, Yost & Dankmeyer, Carlyle Barton, Jr., Baltimore, Md., Barnes, Kisselle, Laughlin & Raisch, John M. Kisselle, Detroit, Mich., Fisher & Christen, L. Aubrey Goodson, Jr., Washington, D. C., for plaintiffs.

Clark, Smith & Prendergast, Richard W. Case, Baltimore, Md., Mead, Browne, Schuyler & Beveridge, Andrew B. Beveridge, Washington, D. C., for defendants.

R. DORSEY WATKINS, District Judge.

This is an action for alleged patent infringement, unfair competition and trademark infringement, brought by the inventor and his exclusive licensee. During the trial, the claims for unfair competition and trademark infringement were dismissed with prejudice.[1]

Defendants moved for summary judgment on the pleadings together with patent No. 597,402, issued to E. H. Duche-

---

1. In oral argument, and in their brief later filed, plaintiffs make a "plea for treble damages." This relief was not prayed in the complaint, and no motion was made to have the pleadings amended to conform with the proof.

min, filed with the motion. The motion was overruled after hearing in open court.[2]

Thereafter an amended complaint was filed. Defendants filed the usual answer, denying the allegations of validity of the patent in suit on the ground of the prior art, disclosures in patents and printed publications, prior knowledge and use, defects in the claims, and misuse of the patent. Defendants also counter-claimed for a declaratory judgment that the patent in suit was invalid and not infringed.[3] A second amended complaint was filed to add a new party defendant.

The patent in suit (S. M. Collins, 2,-667,218 filed February 1, 1952, issued January 26, 1954) is for a "folding closure". Its object was to provide an attractive-looking folding door which could be easily installed in a household opening without special hardware and which could be manufactured of easily available materials to provide an inexpensive but attractive hingeless door closure. These ends[4] are attained by the product manufactured by the corporate plaintiff under the patent.

The specifications state:

"Briefly, the invention consists of double sheets of decorative material such as leather, plastic or fabric which are sewed into vertical pockets, closed at the top, and in which is inserted a stiffening panel of inexpensive material provided with a supporting device which projects through the top of the pockets to co-operate with a slide."

The claims to which the proceedings were directed are 8, 9 and 10, reading as follows:

"8. A foldable closure for doorways which comprises a plurality of thin, flat, elongate panels adapted to form a door when in aligned position, separate supporting means at the top of each panel centrally thereof, a track for slidably mounting said supporting means at the top of a door opening, and an ornamental sheathing for said panels covering each side and joined between said panels to space the panels and being flexible to form with the panels a hinged series of panels positionable at will in closely spaced, parallel relation or in aligned relation, the joined portions of the sheathing forming the sole hinge between the panels.

"9. A combination as defined in claim 8 in which the sheathing is closed at the top to receive its sole support from the top edges of said panels.

"10. A combination as defined in claim 9 in which the sheathing is open at the bottom to permit the removal and replacement of individual panels."

At the trial, defendants admitted infringement if plaintiff's patent were held valid.

The defenses relied upon were (1) anticipation by prior patents; (2) prior knowledge and use; and (3) lack of patentable invention.

### 1. Prior Patents.

The device disclosed by the specifications and drawings, and claimed in Claim 10 (in combination with claims 8 and 9)

---

2. Coleman, C. J., May 14, 1954. No opinion for publication. Defendants' motion to dismiss the claim for unfair competition was at the same time overruled.

3. At the trial, defendants originally urged that patentee-plaintiff's license agreement violated the anti-trust laws. This was abandoned, apparently on the authority of Glen Haven Knitting Mills v. Sanson Hosiery Mills, 4 Cir., 1951, 189 F. 2d 845, 854.

4. The uncontradicted evidence was that the door sold at a retail cost of one-third to one-half the price of folding doors built before the patented device. Esthetic tastes might differ as to the attractiveness of the door, but the accused device, and the product of another competitor, were postgraduate Chinese copies. Plaintiffs' claim of easy installation was only half-heartedly attacked in view of the parroting of this descriptive language in defendants' manual of instructions.

may be summarized as comprised of [5] (a) double sheets of decorative material, (b) (1) which are sewed into vertical pockets, closed at the top and (2) open at the bottom to permit removal and replacement of panels; and (c) in which is inserted a stiffening panel, (d) provided with a supporting device which projects through the top of the pockets to cooperate with a slide, (e) the joined portions of the sheathing forming the sole hinge between the panels.

By way of patent anticipation, defendants offered in evidence copies of the following patents:

| Inventor | Device | Number | Issuance Date |
|---|---|---|---|
| Parker | Hinge for Blinds | 553,931 | Feb. 4, 1896 |
| Duchemin | Curtain | 597,402 | Jan. 18, 1898 |
| Holtzclaw | Portiere | 661,608 | Nov. 13, 1900 |
| Simmons | Buggy-Boot | 742,748 | Oct. 27, 1903 |
| Burford | Wardrobe | 835,701 | Nov. 13, 1906 |
| *Applas | Vehicle Curtain | 1,024,305 | Apr. 23, 1912 |
| Goldhahn | Folding Screen | 1,282,685 | Oct. 22, 1918 |
| *Cone | Radiator Screen for automobiles | 1,558,533 | Oct. 27, 1925 |
| Kaplan, et al | Automobile Top | 1,835,405 | Dec. 8, 1931 |
| *Nordell | Foldable Curtain | 1,877,950 | Sep. 20, 1932 |
| Byron | Window Curtain | 2,002,171 | Feb. 26, 1934 |
| Haines | Fireplace Screen | 2,080,708 | June 24, 1936 |
| Kwon | Bamboo Curtain | 2,244,300 | June 3, 1941 |
| Brokering | Flexible Device | 2,257,103 | Sep. 30, 1941 |
| *Wirthman | Blackout Device | 2,325,992 | Aug. 3, 1943 |
| Skelly | Flexible Wall Structure | 2,458,537 | Jan. 11, 1949 |

The wide range of the cited patented devices makes it impractical, within any reasonable space, to analyze each one separately as it may apply to the five features of the device in question. Each was discussed by the witnesses and counsel as it was introduced, was dealt with in oral argument at the conclusion of the case and in briefs subsequently filed, and was considered by the Court, both during the trial, and in the light of the arguments and the briefs. I find as a fact and conclude as a matter of law that with respect to the above-mentioned five constituents of the device, the use of: (a) double sheets of decorative material is anticipated by Holtzclaw, Cone, Brokering and Nordell; (c) a stiffening panel inserted in pockets is anticipated by Holtzclaw, Duchemin, Simmons, Kaplan, Cone, Kwon, Broker-ing and Wirthman; (d) a panel-supporting device which projects through the top of the pockets to cooperate with a slide is anticipated by Holtzclaw, Parker, Burford, Applas, Byron and Kwon; and (e) joined portions of panel sheathing forming the sole hinge between the panels is anticipated by Holtzclaw, Duchemin, Cone, Brokering and Wirthman.

The cited patents disclose suspended slats, permanently hinged; slats of varying lengths permanently and independently enclosed in material, and permanently hinged; and slats of varying length sewn into closed pockets. None of them shows separately, and none suggests, a combination of individually suspended and unjoined panels covered by a vertically pocketed cover closed at the top and open at the bottom, as is

5. Plaintiffs admit that the "separate supporting means at the top of each panel" and a "track for slidably mounting said supporting means at the top" are not novel.

* References cited in the file of the patent.

disclosed in the patent in suit, whereby the panels serve the dual function of stiffening the cover, and in addition to supporting the cover generally, do so in a way preventing sag; and the cover performs the dual function of a cover and a hinge; the result being a suspended accordion folding door.[6]

## 2. Prior Knowledge and Use.

The defense of prior knowledge and use was primarily based upon the testimony of one of the defendants, Barney H. Kraft, although an effort was made to establish prior knowledge and use by the witness Nicholson, produced by plaintiffs. At first blush, Kraft's testimony had been strongly indicative of anticipation. He testified that he had been engaged in the manufacture of custom-made curtains and closures for many years, and that he had seen and made, 35–40 years ago, "doors" equivalent to the Collins closure. They were made of a double thickness of canvas, supported on loose panels of plyboard, the canvas being double stitched to keep the panels separated, so that the canvas would fold. The panels had holes at the top, and pins were inserted through the two thicknesses of canvas, passing through the holes, which pins were then supported by rings strung on ordinary curtain poles. He claimed that these devices as closures were in general use during 1915–1917. The initial effect of this rather general testimony was, in my opinion, completely destroyed by a number of factors later developed both on his examination in chief and on cross-examination.

(1) Kraft was extremely vague as to the use of such a door. He could not recall the name of any competitor, any specific installation, or of any such doors having been produced since 1917. He did not claim the manufacture of any canvas closures except between 1915–1917, after which he used bamboo doors (or curtains) these being much easier to handle than canvas.[7] (2) He could recall substantially nothing of his business during this possibly critical period, except the street location of his shop. He could recall no specific sales; had no records, models, sketches, pictures, and could not name a single manufacturer or purchaser, and he offered no substantiation or corroboration. (3) He admitted that his alleged device permitted some sagging. (4) In response to a written interrogatory as to prior invention, he had not named himself and in fact did not disclose this "anticipation" to his attorneys until in the courtroom after the trial had begun. (5) He identified defendants' model of Holtzclaw as similar to his door. This model in fact had glued short stiffeners for only a few inches at the top, the material acting as hinges. The patent calls for "hinged joints" in the form of permanent independent hinges. (6) He showed an unfortunate willingness to testify, as if he were an expert, on the prior art. He testified that he had seen the Duchemin "curtain" on street cars, and as a closure between subway

---

**6.** The other attributes of maintenance of fold lines from fully opened to fully closed position of the door; absence of visible hardware; ease and cheapness of manufacture; absence of separate hinges; and removability and replacement of the cover and any panel or panels, will be considered in greater detail under the point of novelty, below.

In connection with removability of panels or stiffeners, the only patent that expressly refers thereto (or which would seem to permit independent removal) is Brokering. The primary stated purposes of Brokering were to provide an articulated seat and back rest for a chair;

which articulated member could be used for a door. One suggestion of the patent was that a padded kapok assembly could be removed from a deck chair and used as a life preserver. In such case the "slats * * * may be attached to the assembly by rivets * * * or for some purposes may be left loose so that as the life-preserver is placed in position the slats drop out, or may be slidably removed, for the comfort of the wearer."

**7.** He offered no reason why the stated "general use", as well as his own manufacture, suddenly completely ceased in 1917.

cars.[8] As to such closure he stated that if the bottom support were removed, the curtain would hang loosely. He quickly receded from this position, and admitted that he had "misread" the patent, and that there were no supporting clips at the top, and no suspension. (7) He had sought to obtain an exclusive license from plaintiffs.

Nicholson, initially called by plaintiffs, and then called by defendants as their witness, made a very favorable impression upon the Court by his candor, apparent honesty, complete disinterestedness,[9] accurate memory, and businesslike manner.[10] He had been in the canvas goods and awning business since 1911. He had attended many industry conventions and had never seen or heard of a reinforced canvas closure of the type described by Kraft. The only canvas cover with stiffeners he had ever seen was a vertical one for kiln doors, which was a permanent installation. In his opinion, canvas duck would be too heavy for interior closures.[11] When called by defendants, Nicholson testified that he had seen stiffeners employed in portiere construction. In one type, there was a continuous pocket or hem in the top of the portiere, in which buckram was inserted as a stiffener, stitching passing right through the buckram. The other type had pockets two to four inches deep in the top of each end, formed by vertical stitches. Stiffeners were cut slightly smaller, inserted, and the top hemmed shut, so that the stiffener was tightly enclosed on all sides.

Barney H. Kraft's testimony does not establish prior knowledge and use. Nicholson's testimony not only does not affirmatively establish prior knowledge and use, but also tends to rebut it.

3. Lack of Patentable Invention.

The combination patent in suit, if valid, must pass the severe test laid down in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, since the Fourth Circuit has held that the rule laid down in that case was not changed by the revision of the patent laws in 1952. Interstate Rubber Products Corporation v. Radiator Specialty Co., Inc., 4 Cir., 1954, 214 F.2d 546, 549; Gordon Cartons, Inc., v. Alford Cartons, 4 Cir., 1954, 218 F.2d 246, 250; Pollard v. American Phenolic Corporation, 4 Cir., 1955, 219 F.2d 360, 363; see also Todd v. Sears, Roebuck & Co., 4 Cir., 1954, 216 F.2d 594, 596.

The weight of the credible evidence is that the new combination found in the Collins door has novel advantages and a greater utility than any comparable disclosure in the art. These include simplicity; the privacy of a door as distinguished from a curtain, or hinged slats;[12] fold lines as distinguished from a flat line, visible at all stages from the fully opened position to the fully closed position; the absence of visible hardware, except for the small support shaft; ease in replacing a broken panel, or even an entire cover, if a change is made in the surrounding decor; ease and cheapness of fabrication in that (a) the completely covered suspended panels can be made of cheap and unfinished or roughly finished material; (b) no separate hinges are required; and (c) the cover may be easily stitched if cloth is used, or heat sealed if vinyl is used

8. The Duchemin patent claimed the device exclusively to be a "curtain". One of the nine figures shows a "curtain as partially drawn horizontally". All the unfolded sections were designed to be flat, so as to "become practically a section of a wall."

9. He did not know any of the parties to the suit.

10. He had records of his family's business going back to 1906.

11. A fortiori, double thicknesses would be even more inappropriate.

12. The "bamboo closure" offered in evidence permitted an outline apperception of objects on the opposite side to one standing several feet away, and a complete perception to one standing within one foot of the closure.

(which is in fact the case), because of the straight vertical and top seam lines; and standard size doors can with relative ease, be adapted to offsize openings.

With the 20/20 vision of hindsight, it may now appear simple to hang a pocketed cover over independently supported stiffeners, and form an accordion folding closure. "Knowledge after the event is always easy, and problems once solved appear as never having presented difficulty." Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 1948, 168 F.2d 778, 781.

In this case what evidence there is as to prior efforts to achieve the instant result indicates that the invention was not obvious. Defendants cited one Joseph Rosenfeld as prior user, prior inventor, and as one having prior knowledge of the invention. According to his deposition, Rosenfeld is president of American Bamboo Corporation, Acme Venetian Blind Corporation and Accordofold Corporation, of which companies Acme and Accordofold manufactured "closure members and doors for walk-through passages." More than twenty-five years ago he "took an old type porch shade" of basswood and inverted it to make closures and partitions. A few years later, he made them of bamboo. Then in 1929, he started work on "a solid closure" an opaque closure "that would give complete privacy." He dropped this, to work on Venetian blinds, until 1935, when he made another model of a solid closure. He made another in 1946, after he came out of the Army, out of vinyl. He "glued rigid inserts" of corrugated cardboard, into "pockets", and suspended them on a standard traverse track. In April or May, 1954, American Bamboo Company began the manufacture and sale of a door that "looks like" the Collins door.[13] He further deposed that he had "been working with these type of things for many years" prior to 1952; that he had

"many types of folding doors. I have a museum of my own since I'm interested in folding closures. It's the only work I've done all my life." He worked on models since 1929; he was "working all the time."

Evidence as to Rosenfeld's 1946 model was that it was as he described it. Between two sheets of vinyl, strips of corrugated cardboard, spaced apart, were glued, the openings between them extending from top to bottom; that is, the cover was not joined between the panels. The hardware at the top was completely visible, V-shaped clips enclosing both sides of the sheets and the cardboard, transfixed by rivets through the vinyl and cardboard. It is obvious that the panels were not in pockets and were not removable, and that the device in no way anticipated the Collins closure. Rosenfeld, with the same materials available, and seeking the same end, did not succeed, and abandoned his model for a direct copy[14] of the Collins door.

This testimony would appear to bring this case within the holdings in Watson v. Heil, 4 Cir., 1951, 192 F.2d 982, 985, and L-O-F Glass Fibers v. Watson, 1955, 97 U.S.App.D.C. 69, 228 F.2d 40, 46-47.

The utility and success of the Collins structure are evidenced by "the tribute of * * * imitation", Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 441, 31 S.Ct. 444, 450, 55 L.Ed. 527; Ackerman v. General Motors Corp., 4 Cir., 1953, 202 F.2d 642, 645. The defendants, and Rosenfeld and two others, copied the Collins structure, and defendant Barney H. Kraft had sought an exclusive distributorship.

The Fourth Circuit, in Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 1948, 168 F.2d 778, 782, recognized

13. The American Bamboo Company door and the Collins door do indeed "look alike"; as much so as the proverbial peas in a pod.

14. The Collins door came on the market in late 1952, and the Rosenfeld door in April or May 1954. The two are identical. It is almost certain that someone copied, and it is reasonable to assume that the later copied the earlier.

**168**

"'\* \* \* the presumption arising from the imitation of the patented article by the manufacturer of the alleged infringing device. As to this, we agree with what was said by Judge Hough, speaking for the Circuit Court of Appeals of the Second Circuit in Kurtz v. Belle Hat Lining Co., 280 F. 277, 281: "The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think"'."

■ The corporate plaintiff has operated at a profit, with sales of $182,800 in 1953, $393,800 in 1954, and $851,500 in 1955. Approximately one-half the sales were to home owners for private installation; forty percent to builders, and ten percent to trailer manufacturers. Commercial success may turn the scales in close cases. Smith v. Hall, 1937, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049; Hutzler Bros. v. Sales Affiliates, 4 Cir., 1947, 164 F.2d 260, 267; Eastern Venetian Blind Co. v. Acme Steel Co., 4 Cir., 1951, 188 F.2d 247. The commercial success is even more striking and significant in this case than is normally so. The corporate plaintiff was a new company, and neither it nor its officials had any established advertising or sales organization.

■ The statutory presumption of validity from the issuance of a patent [15] means that "the burden of proving want of novelty is upon him who avers it \* \* \* but his burden is a heavy one, as it has been held that 'every reasonable doubt should be resolved against him.'" Mumm v. Jacob E. Decker,

1937, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983.

Defendants contend that the presumption of validity is weakened because the Examiner did not cite all the prior art relied upon by defendants; especially Holtzclaw and Duchemin. To this there are two answers. First, neither Duchemin nor Holtzclaw, separately or together, teaches independently suspended panels inserted in pockets closed at the top and open at the bottom.[16] Secondly, as observed in Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 1953, 208 F.2d 1, 4, certiorari denied 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075:

"Defendants' argument based on these prior art patents, not cited in the patent office, is not convincing. It has been held, and we think with logic, that it is as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as to conclude that it was inadvertently overlooked. Adler Sign Letter Co. v. Wagner Sign Service, 7 Cir., 112 F.2d 264, 267; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794, 802."

■ I find that plaintiff Collins' door is a new, and useful and novel combination which would not have been obvious to a person having ordinary skill in the art, and that claim 10 of the patent is valid and infringed. If the parties cannot agree upon the damages, the case will be referred to a special master for an accounting, after which the Court will determine whether the amount so fixed shall be increased. U.S.C. Title 35, § 284; Pollock v. Martin Gauge Co., 7 Cir., 1919, 261 F. 201; Anchor Hocking Glass Corporation v. White Cap Co., D.C.Del.1943, 47 F.Supp. 451; Austral

15. U.S.C. Title 35, § 282:
"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

16. Defendants offered in evidence a "reasonable replica" of Holtzclaw. In their briefs, they argue that although the "rep-

lica" shows the hangers piercing the fabric, this is not what the patent teaches. If defendants could not correctly interpret the patent in their model, the patent could not lead the hypothetical person "skilled in the art" to the production of the Collins door.

Sales Corporation v. Jamestown Metal Equipment Co., D.C.N.Y.1941, 41 F. Supp. 508.

Counsel for the parties may submit an appropriate order.